# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **SHEILA LANG**, | |
| Plaintiff, | |
| v. | Civil Action No. 20-1199 (TSC) |
| **DISTRICT OF COLUMBIA**, *et al.*, | |
| Defendants. | |

## MEMORANDUM OPINION

Plaintiff Sheila Lang brings this action against the District of Columbia and Anna R. Krughoff.  Plaintiff alleges that, based on events during her tenure as a teacher for the District of Columbia Public Schools ("DCPS"), Defendants violated her rights under the First Amendment, Title VII of the Civil Rights Act ("Title VI"), the Age Discrimination in Employment Act ("ADEA"), and the D.C. Human Rights Act ("DCHRA").  Third Am. Compl., ECF No. 15 ("TAC").  Defendants have moved to dismiss Plaintiff's claims in their entirety.  Defs.' Mot. to Dismiss, ECF No. 18 ("MTD").  For the reasons that follow, the court will GRANT in part and DENY in part Defendants' Motion to Dismiss.

## I.   BACKGROUND

### A.  Facts

At the motion to dismiss stage, the court assumes the following allegations to be true. Plaintiff is a Black, non-Latina, American woman who, while in her sixties, worked as a reading resource teacher from 2011 until 2018 at DCPS-operated Cleveland Elementary School ("Cleveland").  TAC ¶¶ 3(a), 4(a).  In that capacity, she was subject to the collective bargaining

agreement between DCPS and the Washington Teacher's Union ("Bargaining Agreement").

Section 7.11.1 of the Bargaining Agreement provides:

> As appropriate protocol, and when possible, all differences of an interpersonal nature should be worked out between an informal conference between the Teacher and the Administrator. When interpersonal differences occur, the parties recognize that it is inappropriate to criticize each other in the presence of others.

*See id.* ¶ 4(d)(2).[1]  Defendant Krughoff became Cleveland's principal in May 2017. *Id.* ¶ 5(a).

Plaintiff alleges that beginning in 2004, "much of the neighborhood surrounding Cleveland became racially gentrified by white families, many of whom enrolled their children at Cleveland." *Id.* ¶ 14(a). She claims that starting in 2013, "white gentrifying parents" conspired with DCPS officials, including Krughoff, to target "middle-aged, black African-American professionals" at Cleveland with "(1) unjustifiably low performance or work evaluations; (2) defamation; (3) involuntary transfers; (4) administrative leave and disciplinary investigations as a form of reprimand, demotion, suspension, or harassment; (5) excessing . . . jobs into nonexistence; and (6) forced retirements." *Id.* ¶ 15.

These targeted actions were allegedly taken repeatedly over the course of several years and against multiple Black women employees at Cleveland. In 2013, DCPS gave "an unjustifiably low performance evaluation" not only to Plaintiff, but also to her colleagues Rita Mickey and Delores Rushing. *Id.* ¶¶ 16(d), 21(i). Plaintiff alleges that Cleveland administrators

---

[1] While Plaintiff's allegations only cite excerpts, the entire Bargaining Agreement is available at https://dcps.dc.gov/sites/default/files/dc/sites/dcps/publication/attachments/WTU-DCPS%20Contract%202016-2019.pdf. "A court may take judicial notice of facts contained in . . . government documents available from reliable sources." *Detroit Int'l Bridge Co. v. Gov't of Canada*, 133 F. Supp. 3d 70, 84-85 (D.D.C. 2015) (citing *Abhe & Svoboda, Inc. v. Chao*, 508 F.3d 1052, 1059 (D.C. Cir. 2007)). Moreover, the court may consider "documents attached as exhibits or incorporated by reference in the complaint, or documents upon which the plaintiff's complaint necessarily relies even if the document is produced not by the plaintiff in the complaint but by the defendant in a motion to dismiss." *Ward v. D.C. Dep't of Youth Rehab. Servs.,* 768 F. Supp. 117, 119 (D.D.C. 2011) (citations omitted).

intended those evaluations to cause the removal of the women "from the school on account of their race, color, national origin, or age." *Id.* ¶¶ 16(d), 21(k), 21(n).  She claims that during the 2015-16 school year, Cleveland, "with encouragement from white gentrifying parents, barred Ms. Lang from selling snacks inside the Cleveland school building" to raise money for field trips, forcing her to "[sell] snacks outdoors, sometimes in bitterly cold or otherwise unpleasant weather." *Id*. ¶¶ 17(b)-(e).  At the same time, Cleveland "allowed the white gentrifying parents to sell snacks inside the Cleveland school building, so that they could raise funds for extracurricular activities." *Id.* ¶ 17(f).  Meanwhile, another teacher, Jacqueline Nelson, was "railed against" with criticism of her field trips until she felt forced to retire. *Id.* ¶ 18.  And in 2017, Cleveland administrators gave teacher Charisse Robinson an unjustifiably low rating, *id.* ¶ 19, and warned nurse Tina Samuels not to "object[] to the demands of Cleveland's white gentrifying parents," *id*. ¶ 20.

Plaintiff also alleges that from 2013 through 2018, Cleveland maintained a "racially bigoted 'dual language program.'" *Id.* ¶ 4(c).  The program "segregated" students "by placing an overwhelming majority of the nonwhite, English-language students in English-only classes while placing nearly all of the white students in a . . . Spanish immersion program." *Id.*  The "gentrifying white students" in the program "benefitted from a relatively low student-teacher ratio, and from a student body with very few, if any, special education or emotionally troubled students." *Id.* ¶ 22(c).  The racial disparity persisted "despite the alleged use of a DCPS lottery for selecting students for the program." *Id.* ¶ 22(e).  "Because of the racist undergirding of the dual language program, many of Cleveland's black professionals opposed the program." *Id.* ¶ 22(i).  Plaintiff alleges that their opposition made them targets for Cleveland's white parents and administrators. *Id.* ¶ 22(j).  DCPS actions in giving a "biased evaluation of Rita Mickey,"

"false and defamatory criticism of [Rita] Samuels," and denying Plaintiff permission to fundraise inside the school "obliged" all three employees "to support the dual language program or to keep quiet about its racist segregation of Cleveland's students." *Id.* ¶¶ 22(k), (m), (o).

In June 2017, Plaintiff used the funds she raised from selling snacks to sponsor a field trip to Europe for interested Cleveland students. *Id.* ¶¶ 24(a)-(b). Eight students and one parent joined the trip, which was to depart from John F. Kennedy Airport in New York City. *Id.* ¶ 24(e). While Plaintiff was at the departure gate, however, the students and parent "slipped away from Ms. Lang and secretly shopped at a mall inside the airport." *Id.* ¶ 24(f). Plaintiff boarded the plane and did not realize until the flight reached London that the rest of the group had missed the flight. *Id.* ¶¶ 24(g)-(h). DCPS would later investigate the incident, and in September 2017 found "no wrongdoing on her part with regard to the field trip." *Id.* ¶ 24(j).

Plaintiff claims that in the aftermath of that incident, Krughoff "organized with several of Cleveland's white gentrifying parents so as to establish a campaign that complained falsely to DCPS that [Plaintiff] abandoned the Cleveland students at JFK Airport," and "conspired to target Lang to be fired or at least to be removed from Cleveland on the basis of her race, color, national origin." *Id.* ¶¶ 25(d)-(e). On November 8, 2017, Krughoff and DCPS involuntarily transferred Plaintiff from her assignment at Cleveland to Browne Education Campus ("Browne") effective November 27 and placed her on administrative leave for the intervening weeks. *Id.* ¶¶ 26(a), (e)-(f).

Plaintiff alleges that at least two Black Cleveland employees protested her involuntary transfer and were punished for it: Robyn Knight and Rodney Carter "complained directly to Principal Krughoff and in front of each other that Krughoff lacked a valid basis for involuntarily transferring Lang to Browne," and that the transfer was "illegal," "punitive," and "racially

discriminatory." *Id.* ¶¶ (g)-(h).  In retaliation, Defendants allegedly "excessed"—eliminated—Carter's job position as Director of School Operations and Knight's position as Mathematics Assistant Principal.  *Id.* ¶¶ 26(v)-(z).  Knight was allowed to remain at Cleveland as General Assistant Principal, but Carter was effectively forced to retire.  *Id.* ¶¶ 26(y)-(z).

While Plaintiff was on administrative leave, she was invited by Cleveland's Parent-Teachers Association ("PTA") "to speak as one of its dues paying members at its November [15, 2017] meeting" about her involuntary transfer and its impact on "the literacy instruction and the emotional wellbeing of black students."  *Id.* ¶¶ 26(i)-(j).  The meeting was held at Cleveland after school hours, and Krughoff was in attendance.  *Id.* ¶¶ 26(k)-(*l*).  In her speech, Plaintiff "condemn[ed] Cleveland's illegal workplace harassment" and her "involuntary transfer to Browne on the basis of her race, color, national origin, and age, with this involuntary transfer harming the literacy instruction and the emotional wellbeing of many of Cleveland's black students."  *Id.* ¶ 26(m).  Plaintiff also "declared more or less that 'there are people going downtown [to DCPS] saying false things about [middle-aged black] teachers.'"  *Id.* (alterations in original).  Plaintiff then said that anyone in the audience behind those alleged wrongs should "Stand up and make yourselves known!"  *Id.* ¶ 26(q).  When no one stood, Plaintiff "continued with her speech by calling on those who opposed both Cleveland's hostile workplace and its harmful impact upon Cleveland's students to 'Stand up!'"  *Id.* ¶ 26(s).

Plaintiff alleges that following her speech at the PTA meeting, Krughoff filed "a complaint or an adverse action" against her, and DCPS placed her "on forced administrative leave for more than seven months" while it "investigated the speech."  *Id.* ¶¶ 31(a)-(b), 32(a).  Plaintiff claims those actions were punishment for violating the Bargaining Agreement's Section 7.11.1.  *Id.* ¶ 30(a).  On June 15, 2018, while the investigation was ongoing, DCPS eliminated

Plaintiff's former position at Cleveland.  *Id.* ¶ 35(a).  Under the Bargaining Agreement, Plaintiff had a limited time to seek another DCPS job, but she concluded that doing so would be futile and so decided to retire on June 30, 2018.  *Id.* ¶¶ 35(h)-(*l*), 36.  The next month, DCPS informed Plaintiff by letter that its investigation had "substantiated" allegations about her "insubordination and discourteous treatment."  *Id.* ¶ 34(a).[2]

## B.  Procedural history

In April 2019, Plaintiff filed a charge with the Equal Employment Opportunity Commission ("EEOC"), alleging retaliation, a hostile work environment, and discrimination on the basis of race, color, national origin, and age.  TAC ¶ 85; *see* MTD, Ex. 1.  In November 2019, the EEOC issued Plaintiff a right to sue letter.  TAC ¶ 85.

Plaintiff initially brought this action in the Superior Court of the District of Columbia; it was removed to this court in May 2020.  *See* Notice of Removal, ECF No. 1.  The court granted Plaintiff leave to file a Third Amended Complaint later that year.  *See* TAC.

Plaintiff's claims fall into four categories:

(1) a First Amendment retaliation claim, TAC ¶¶ 27-39 (Count 1);

(2) hostile work environment claims based on race, color, national origin, or age under Title VII, the ADEA, and the DCHRA, *id.* ¶¶ 40-45, 51-57, 61-68 (Counts 2, 4, and 6);

(3) retaliation claims under those statutes, *id.* ¶¶ 72-84 (Counts 8, 9, and 10); and

(4) claims under those statutes that Defendants negligently failed to protect her against the hostile work environment, *id.* ¶¶ 46-50, 58-60, 69-71 (Counts 3, 5, and 7).

---

[2] Plaintiff alleges that while she was being investigated and on leave, Defendants violated the terms of the Bargaining Agreement in various ways.  *See* TAC ¶¶ 25(h)-(i), 26(a)-(d), 31(c), 32(c)-(d), 33(c)-(d), 34(a)-(b), 35(a)-(h), 39.  But she does not claim that she challenged those violations under the Bargaining Agreement and does not raise any unfair labor practice or similar claims here.

The pleadings also include a "Count 11: EEOC Right to Sue Letter." *Id.* ¶¶ 85-86. That Count does not set forth any cause of action, but merely states that Plaintiff's filed an EEOC charge and received a right to sue letter. *Id.* Consequently, Count 11 does not set forth any claim for relief and will be dismissed.

## II.   LEGAL STANDARD

A motion to dismiss for failure to state a claim under Rule 12(b)(6) tests the legal sufficiency of a complaint. *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002). The court does not assess the truth of what is asserted nor "whether a plaintiff has any evidence to back up what is in the complaint." *Id.* (citation omitted). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citation omitted). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (citation omitted). "Factual allegations must be enough to raise a right to relief above the speculative level" and move plaintiff's claims "across the line from conceivable to plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 555, 570 (2007). Facts that are "merely consistent" with a defendant's liability do not meet the plausibility standard. *Iqbal*, 556 U.S. at 678 (citation omitted).

"Courts in this Circuit 'have consistently recognized the ease with which a plaintiff claiming employment discrimination can survive . . . a motion to dismiss.'" *McNair v. District of Columbia*, 213 F. Supp. 3d 81, 86 (D.D.C. 2016) (quoting *Fennell v. AARP*, 770 F. Supp. 2d 118, 127 (D.D.C. 2011)). A plaintiff need not "plead every fact necessary to establish a prima facie case to survive a motion to dismiss." *Jones v. Air Line Pilots Ass'n, Int'l*, 642 F.3d 1100, 1104 (D.C. Cir. 2011) (citation omitted); *see Farrar v. Wilkie*, No. 18-cv-1585, 2019 WL 3037869, at *2 (D.D.C. July 11, 2019) (citing *Gordon v. U.S. Capitol Police*, 778 F.3d 158, 161–

62 (D.C. Cir. 2015)).  Nonetheless, a plaintiff must allege sufficient facts to make such a claim

plausible, such as what happened, who was involved . . . and how such conduct constitutes . . .

discrimination."  *Arnold v. Speer*, 251 F. Supp. 3d 269, 273 (D.D.C. 2017); *see Harris v. D.C.*

*Water & Sewer Auth.*, 791 F.3d 65, 70 (D.C. Cir. 2015) (explaining that while a plaintiff need

not plead a prima facie case on a motion to dismiss, the plaintiff must nonetheless allege facts

that if accepted as true would make the discrimination claims plausible).

In assessing a motion to dismiss, the court presumes the truth of a plaintiff's factual

allegations, *see Iqbal*, 556 U.S. at 679, and construes the complaint "in favor of the plaintiff, who

must be granted the benefit of all inferences that can be derived from the facts alleged," *Hettinga*

*v. United States*, 677 F.3d 471, 476 (D.C. Cir. 2012) (internal quotation marks and citation

omitted).  This presumption does not apply, however, to a "legal conclusion couched as a factual

allegation."  *Iqbal*, 556 U.S. at 678; *see Ralls Corp. v. Comm. on Foreign Inv. in U.S.*, 758 F.3d

296, 315 (D.C. Cir. 2014) (the court "do[es] not accept as true . . . the plaintiff's legal

conclusions or inferences that are unsupported by the facts alleged").

### III.    ANALYSIS

The court will address Plaintiff's four categories of claims in turn.  Ultimately, the court

concludes that Plaintiff's First Amendment claim against Krughoff and some of Plaintiff's

hostile workplace environment claims against the District may proceed, but the remaining claims

must be dismissed.

### A.  <u>First Amendment claim</u>

Plaintiff seeks to hold Defendants liable under 42 U.S.C. § 1983 for violating her First

Amendment rights by retaliating against her for her speech at the November 15, 2017 PTA

meeting.  Although Plaintiff has adequately stated a claim that Krughoff violated clearly

established First Amendment rights and therefore is not shielded by qualified immunity, she has failed to establish a basis for municipal liability.

1. Qualified immunity

Qualified immunity shields government officials sued in their individual capacity unless they "violated a statutory or constitutional right" that was "'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735, 743 (2011).[3] "'Clearly established' means that . . . existing law must have placed the constitutionality of the officer's conduct 'beyond debate.'" *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (quoting *al-Kidd*, 564 U.S. at 741). "[T]here is no need that 'the very action in question [have] previously been held unlawful.'" *Navab-Safavi v. Glassman*, 637 F.3d 311, 317 (D.C. Cir. 2011) (quoting *Wilson v. Layne,* 526 U.S. 603, 615 (1999)). But the law must have been "sufficiently clear that every reasonable official would understand that what he is doing is unlawful." *Wesby*, 138 S. Ct. at 589 (quotations omitted). Accordingly, the court looks "to cases from the Supreme Court and [the D.C. Circuit], as well as to cases from other courts exhibiting a consensus view." *Bame v. Dillard*, 637 F.3d 380, 384 (D.C. Cir. 2011) (citation omitted), *as amended* (Mar. 29, 2011). Under that standard, the First Amendment rights allegedly violated here were clearly established.

The Supreme Court has long maintained that teachers do not "relinquish the First Amendment rights they would otherwise enjoy as citizens to comment on matters of public interest." *Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205, Will Cnty., Ill.*, 391 U.S. 563,

---

[3] Plaintiff does not state whether she is suing Krughoff in her individual or official capacity. But if she is suing Krughoff in her official capacity, that is tantamount to suing the District of Columbia. "The Supreme Court has noted that '[t]here is no . . . need to bring official-capacity actions against local government officials, for . . . local government units can be sued directly for damages or injunctive relief.'" *Mack v. Aspen of DC, Inc.*, 248 F. Supp. 3d 215, 218 (D.D.C. 2017) (quoting *Kentucky v. Graham*, 473 U.S. 159, 167 n.14 (1985)).

568 (1968).  But those rights must strike "a balance between the interests of the teacher, as a

citizen, in commenting upon matters of public concern and the interest of the State, as an

employer, in promoting the efficiency of the public services it performs through its

employees."  *Id.*

"A public official seeking to make out a claim of retaliation in violation of her First

Amendment rights must meet a four-factor test."  *O'Donnell v. Barry*, 148 F.3d 1126, 1133

(D.C. Cir. 1998) (quotations and citations omitted).

> First, the public employee must have been speaking on a matter of public concern.
> . . .  Second, the court must consider whether the governmental interest in
> promoting the efficiency of the public services it performs through its employees
> without disruption, outweighs the employee's interest, as a citizen, in commenting
> upon matters of public concern, and the interest of potential audiences in hearing
> what the employee has to say.  Third, the employee must show that her speech
> was a substantial or motivating factor in prompting the retaliatory or punitive act
> of which she complains.  And finally, the employer should have an opportunity to
> show by a preponderance of the evidence that it would have reached the same
> decision even in the absence of the protected conduct.

*Id.*  "The first two factors under the *Pickering* test are questions of law for the court to resolve,

while the latter are questions of fact ordinarily for the jury."  *Tao v. Freeh*, 27 F.3d 635, 639

(D.C. Cir. 1994).  At this motion to dismiss stage, therefore, the court focuses its attention on the

first two.

Beginning with the nature of Plaintiff's speech, the court finds that *Pickering* itself

largely places the rights asserted here beyond debate.  In that case, the speech in question was a

teacher's letter to the editor of a local newspaper with respect to a proposed school bond,

criticizing the school board's allocation of school funds between education and athletics.

*Pickering*, 391 U.S. at 566.  The Supreme Court concluded that "the question whether a school

system requires additional funds is a matter of public concern" and that the teacher spoke as a

member of the public when he wrote that letter.  *Id.* at 571-72.  The Court noted that "[t]eachers

are, as a class, the members of a community most likely to have informed and definite opinions as to how funds allotted to the operations of the schools should be spent," so "it is essential that they be able to speak out freely on such questions." *Id.* at 572. As a result, the Court concluded that the First Amendment protected the teacher's letter.

Plaintiff's PTA speech warrants the same protection for the same reasons. Speech addresses public concerns "when it can 'be fairly considered as relating to any matter of political, social, or other concern to the community,' or when it 'is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public.'" *Snyder v. Phelps*, 562 U.S. 443, 453 (2011) (citation omitted). Accordingly, "[a] statement concerning racial discrimination on the part of a public agency is a matter of public concern because it involves information that enables members of society to make informed decisions about the operation of their government." *Tao*, 27 F.3d at 640 (quotations omitted) (citing *McKinley v. City of Eloy,* 705 F.2d 1110, 1114 (9th Cir. 1983) (citing *Thornhill v. Alabama,* 310 U.S. 88, 102 (1946)); *see Givhan v. W. Line Consol. Sch. Dist.*, 439 U.S. 410, 411-13 (1979) (holding that the First Amendment protected a teacher's complaints "involv[ing] employment policies and practices at the school which [Plaintiff] conceived to be racially discriminatory" even when those complaints were "privately expressed . . . to the principal"); *Connick v. Myers*, 461 U.S. 138, 148 n.8 (1983) (confirming that, in *Givhan*, the employee's "right to protest racial discrimination [involved] a matter inherently of public concern"); *Teasdell v. District of Columbia*, No. CV 15-0445 (ABJ), 2016 WL 10679536, at *18-19 (D.D.C. Sept. 16, 2016) ("[S]peaking out about the fact that the Office on Against was discriminating against its older employees qualifies as speech on a matter of public concern."). And like in *Pickering*, a teacher is particularly well positioned to have an informed opinion on the existence and impact of discrimination in the school.

Plaintiff's speech addressed the allegedly discriminatory aspects of "Cleveland's illegal workplace harassment," as well as her own "involuntary transfer to Browne," and claimed that "there are people going downtown [to DCPS] saying false things about [middle-aged black] teachers." TAC ¶ 26(m) (brackets in original). Thus, while Defendants are correct that "a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior," *Connick*, 461 U.S. at 147, they are incorrect that Plaintiff merely "complain[ed] of a personnel action affecting her, and no other employees," MTD at 10. As the court in *Tao* noted, the plaintiff's "complaint of discrimination, while expressed in connection with her disappointment over [being involuntarily transferred], was a matter of serious public import that was broader than her individual personnel dispute." *Tao*, 27 F.3d at 641 (FBI translator complained of discrimination in promotion decisions against not only her, but also against all Chinese Americans in her unit); *see Teasdell*, 2016 WL 10679536 at *18-19. Like the *Pickering* teacher's letter, therefore, Plaintiff's PTA speech on an issue of community interest at her school is entitled to First Amendment protection.

Moreover, Plaintiff spoke "as a citizen," not "pursuant to employment responsibilities." *Garcetti v. Ceballos*, 547 U.S. 410, 423-24 (2006). Plaintiff's job was to teach children, not to address generalized discrimination at her former workplace. *See, e.g.*, *Wilburn v. Robinson*, 480 F.3d 1140, 1151 (D.C. Cir. 2007) ("Wilburn was hired not only to direct personnel matters in [the D.C. Office of Human Rights] but also to root out discrimination in the District government and, thus, when Wilburn commented on racial discrimination in the performance of her duties, she did not speak as a citizen."). Nothing about her employment required her to make her speech to the PTA at Cleveland—a school to which she was not even assigned as a teacher any longer. The fact that Cleveland's alleged discrimination could affect Plaintiff's former students, *see*

TAC ¶¶ 26(i)-(n); MTD at 9-10, does not mean that Cleveland "commissioned" or "paid [Plaintiff] to perform" the duty of decrying that discrimination, *Garcetti*, 547 U.S. at 422, and could therefore control the content of her speech.  In fact, the PTA invited Plaintiff to speak—"as one of its dues paying members"—to address the community's questions.  TAC ¶ 26(j) (emphasis added).  And in her speech, Plaintiff made clear that "I'm here tonight because I know there is a concern" among the PTA community members about discrimination at Cleveland.  *Id*. ¶ 26(n).  Her remarks "had no official significance and bore similarities to" speeches any other PTA member could make.  *Garcetti*, 547 U.S. at 422.  That is quintessential citizen speech.

In contesting this part of the First Amendment analysis, Defendants rely mainly and mistakenly on *Mpoy v. Rhee*, 758 F.3d 285 (D.C. Cir. 2014).  *See* MTD at 9-11.  There, the speech in question was a tiny portion of a long email from a teacher to the DCPS Chancellor.  In that five-page email, the teacher began by identifying himself as a teacher, and identifying his "primary duty" as "ensur[ing] student achievement."  *Id.* at 288, 291.  In addition to complaining at length about classroom resources, misbehaving teaching assistants, and an indifferent school administration, the teacher wrote a single sentence that—he argued—should receive First Amendment protection: that the school principal had "misrepresented students' performance and results" on a standardized test.  *Id.* at 292.  The D.C. Circuit disagreed that the sentence was protected.  In context, those "16 words out of more than 1300" in the email were "also plainly a grievance about [the principal's] interference with [the teacher's] duty to assess and ensure the achievement of his students."  *Id.*  The teacher's complaint in that case confirmed that conclusion; the teacher alleged that the principal had ordered sham assessments of only the teacher's students, and only after he had refused to falsify their records himself.  *Id.* at 293.  In other words, the problem was limited to that teacher and his experience.

*Mpoy* differs from this case, and the analysis comes out the other way. The distinction is not only in the quantity of speech at issue, although Plaintiff's PTA speech obviously dwarfs the single sentence at issue in *Mpoy*. Here, Plaintiff's speech did not take the form of a private email to a DCPS superior; it was a public speech to a community gathering of invested citizens. TAC ¶ 26(k). Moreover, Plaintiff did not limit her remarks to what she perceived as her discriminatory transfer or biased performance evaluation but spoke generally about "Cleveland's illegal workplace harassment" and the system-wide targeting of "middle-aged black teachers" there. *Id.* ¶ 26(m). And while she shared the PTA's concern that Cleveland's discrimination could affect black students, she also plainly opposed that discrimination for its own sake. *Id.* ¶¶ 26(o)-(q). All of that context emphasizes that Plaintiff was not using her speech as "a way to report classroom problems," *Mpoy*, 758 F.3d at 294, but rather to "assert[] that discrimination is occurring against all" women like her at Cleveland, *Tao*, 27 F.3d at 640. As a result, *Mpoy* does not disturb the straightforward conclusion that when Plaintiff addressed the PTA, she was speaking as a citizen on a matter of public concern.

Because Plaintiff spoke as a citizen on a matter of public concern, the First Amendment protects her interest in making that speech unless it is outweighed by the government's interest in "promoting the efficiency of the public services it performs through its employees." *Pickering*, 391 U.S. at 568. At this stage, the court cannot conclude that it does. At the outset, the D.C. Circuit has recognized that "speech alleging discrimination" generally does not "adversely impact an efficient office environment." *Tao*, 27 F.3d at 641 n.5. But more importantly, "[t]here is nothing in the record"—because there is no factual record yet—"to show that [Plaintiff's] speech was disruptive to the functioning of the office, would affect her ability as a teacher, or would impair discipline or working relationships." *Id.* (distinguishing *Connick*, 461 U.S. at 152-

53); *id.* at 641; *see also Pickering*, 391 U.S. at 569-70 (recognizing similar potential government interests).

The D.C. Circuit's decision in *Navab-Safavi* is instructive.  In that case, a translator for the government-directed Voice of America international broadcasting service was fired after she appeared in a music video that "protest[ed] the United States' involvement in Iraq and depict[ed] casualties of the war."  637 F.3d at 313.  The translator sued Voice of America and its officials, who moved to dismiss based on qualified immunity.  Defendants did not dispute that the translator spoke as a citizen on a matter of public concern, but they argued that her speech was nonetheless unprotected because of the "government's strong interest in presenting through an organ with the highest journalistic credibility a clear message of United States policy," such as the United States' involvement in Iraq.  *Id.* at 316.  Specifically, they argued that her public, contrary position could "cause Voice of America to produce biased work" or at least cause the public to "perceive [Voice of America's] broadcasting to be biased because of her editorial role in the agency."  *Id.*  But "[t]aking the allegations of plaintiff's complaint to be true and construing them in the light most favorable to her," the Circuit concluded that those consequences were too speculative to warrant dismissal.  *Id.* at 317.  The Circuit noted that discovery and other factual development might later substantiate Defendants' claims, but "the district court correctly kept [them] in the litigation until that determination."  *Id*.

The Circuit's conclusion that "qualified immunity cannot be based on a 'simple assertion by [Defendants] without supporting evidence' of the adverse effect of the speech on the governmental function" applies with equal force here.  *Id.* at 318 (quoting with modification *Shockency v. Ramsey Cnty.,* 493 F.3d 941, 949-50 (8th Cir. 2007)).  Defendants contend that Plaintiff's PTA speech "impaired discipline by superiors and harmony among co-workers," and

"interfered with the regular operation of the school by publicly discrediting the school and its leadership." But the Plaintiff's allegations do not support those inferences. At most, the Third Amended Complaint acknowledges DCPS's own conclusion that Plaintiff's speech was "insubordinat[e] and discourteous." TAC ¶ 34(a). If true, that conclusion could give DCPS independent, permissible grounds for taking disciplinary action against Plaintiff. But construed in light most favorable to Plaintiff, that allegation does not establish that school discipline, harmony, or regular operation were in fact disrupted by her PTA speech, or even that those consequences could reasonably be expected to follow from the speech. It only states DCPS's conclusion on that issue. Plaintiff does not share that conclusion, alleging to the contrary that her speech—which she made after school hours in a non-official setting—was "dignified and respectful." TAC ¶¶ 26(k), (m). So, even assuming that Defendant's asserted consequences outweigh Plaintiff's right to speak and the public's interest in hearing her, *contra Tao*, 27 F.3d at 641 n.5, those consequences are not alleged in or reasonably inferred from the Third Amended Complaint and therefore cannot form a basis for qualified immunity at this stage.

Based on the allegations before it and the law of this Circuit, therefore, the court concludes that qualified immunity does not shield Krughoff from liability at this juncture. A reasonable official in Krughoff's position would have recognized that a teacher voluntarily addressing a PTA meeting about widespread discrimination at her school was speaking as a citizen about a matter of public interest, and that a reasonable official therefore would have known that responding with "a complaint or adverse action," TAC ¶ 31(b), would run afoul of the First Amendment. In a motion for summary judgment or at trial, Defendants may present evidence that Plaintiff's speech did in fact threaten government interests, or that her protected speech did not substantially prompt their alleged retaliation, or that they would have reached the

same decision even if Plaintiff hadn't made the protected speech. *See Navab-Safavi*, 637 F.3d at 315, 318. The evidentiary record may change "where the *Pickering* balancing tips." *Id.* at 318. But for now, Plaintiff may go forward on her First Amendment claim against Krughoff in her individual capacity.

   2. <u>Municipal liability</u>

To hold a municipality like the District of Columbia liable under 42 U.S.C. § 1983, a Plaintiff must establish both a deprivation of a constitutional right and that the municipality caused that deprivation. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978). As the previous section explained, Plaintiff has pled that she was deprived of a clearly established First Amendment right. But Plaintiff does not plausibly allege that the District of Columbia caused that deprivation, and therefore has not pleaded a claim for municipal liability.

To survive a motion to dismiss, a Plaintiff's claim against a municipality must allege an "affirmative link" establishing that the municipality was the "'moving force' behind the constitutional violation." *Baker v. District of Columbia*, 326 F.3d 1302, 1306 (D.C. Cir. 2003) (first quoting *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823 (1985) (op. of Rehnquist, J.), then quoting *City of Canton v. Harris*, 489 U.S. 378, 389 (1989)). The courts have identified several potential categories of links between municipality and violation, including:

> [1] the explicit setting of a policy by the government that violates the Constitution . . . ; [2] the action of a policy maker with the government . . . ; [3] the adoption through a knowing failure to act by a policy maker of actions by his subordinates that are so consistent that they have become custom . . . ; [or] [4] the failure of the government to respond to a need (for example, training of employees) in such a manner as to show deliberate indifference to the risk that not addressing the need will result in constitutional violations.

*Id.* (quotations omitted). Here, Plaintiff only advances allegations in support of the first and third categories. *See* Pl.'s Opp'n to Mot. to Dismiss at 40-42, ECF No. 19 ("Opp'n"); Defs.' Reply in

Supp. of Mot. to Dismiss at 5-6, ECF No. 22 ("Reply").  Ultimately, however, neither is sufficient to establish municipal liability.

For starters, Plaintiff fails to identify "the explicit setting of a policy by the government that violates the Constitution."  *Id.*; *see also Bd. of Cnty. Comm'rs of Bryan Cnty v. Brown*, 520 U.S. 397 (1997) (referring to this category as "involving an allegation that the municipal action itself violated federal law, or directed or authorized the deprivation of federal rights").  In her pleadings, Plaintiff claims the District punished her pursuant to two policies.  First, she points to D.C. Mun. Regs. tit. 5-E, §§ 1401.1, 1401.2(e), (n), which provide that "adverse action shall be taken for grounds that will promote the efficiency and discipline of [DCPS] and shall not be arbitrary or capricious," and that just cause for adverse action may include "insubordination" and "[d]iscourteous treatment of the public, supervisor, or other employees."  *See* TAC ¶¶ 4(d), 30(a)-(d).  Second, Plaintiff cites the Bargaining Agreement's Section 7.11.1, which provides that "when possible, all differences of an interpersonal nature should be worked out between an informal conference between the Teacher and the Administrator" and that "[w]hen interpersonal differences occur, the parties recognize that it is inappropriate to criticize each other in the presence of others."  *See id.* ¶¶ 4(d), 30(a)-(d).

However, Plaintiff does not explain how or even if the D.C. regulations or the Bargaining Agreement violate the Constitution.  That would be an uphill battle.  As the previous section explained, the First Amendment permits "a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees."  *Pickering*, 391 U.S. at 568.  "Prolonged retention of a disruptive or otherwise unsatisfactory employee can adversely affect discipline and morale in the work place, foster

disharmony, and ultimately impair the efficiency of an office or agency." *Connick*, 461 U.S. at

152. On their face, the D.C. regulations and Bargaining Agreement provisions at issue target

insubordinate, discourteous, or interpersonal disagreement-based speech—the very kind of

disruptive employee speech that the First Amendment permits public employers to police.

Plaintiff has not provided any reason to question that facial constitutionality, and consequently

cannot proceed on a municipal liability claim on the basis of either policy. [4]

Of course, those policies could give rise to municipal liability if they were systematically

applied in unconstitutional ways—that is, if the District had "adopt[ed] through a knowing

failure to act" the "actions of [its employees] that are so consistent that they have become

custom." *Baker*, 326 F.3d at 1306. This is the third category of claims that may establish

municipal liability under § 1983. But to qualify as customary policies under this theory of

liability, the practices must be "so persistent and widespread as to practically have the force of

law." *Connick*, 563 U.S. at 61. That is because the District "could realistically be deemed to

have adopted a policy" only where it "must have been aware" of its "subordinate's discretionary

decisions." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 130 (1988).

Plaintiff's allegations do not plausibly establish a custom sufficient to hold the District

liable. Besides her own experience after her PTA speech, Plaintiff only alleges three other

instances of First Amendment retaliation, spread over the course of several years, and occurring

only at Cleveland. TAC ¶ 4(e). That is not persistent or widespread enough to make such action

part of District policy, or even to infer that the District must have been aware of it. *See, e.g.,*

---

[4] At least one other court in this District has concluded that the Bargaining Agreement is a form
of municipal policy for purposes of § 1983. *Cohen v. Bd. of Trs. of Univ. of D.C.*, 311 F. Supp.
3d 242, 258 (D.D.C. 2018). But unlike in *Cohen*, here there is no assertion that the Bargaining
Agreement itself "is constitutionally inadequate." *Id.* at 256.

*Sheller-Paire v. Gray*, 888 F. Supp. 2d 34, 40 (D.D.C. 2012) (holding that four instances of discrimination did not rise to the level of custom).  Indeed, Plaintiff only alleges that those examples show that "DCPS or a DCPS principal *may* retaliate against a DCPS employee's exercise of his or her right to free speech by enforcing section 7.11.1," TAC ¶ 4(e) (emphasis added), not that DCPS or its officials *do* consistently retaliate.[5]  Likewise, Plaintiff has "failed to allege (even upon information and belief)" that retaliation is more widespread and consistent than her examples show.  *Page v. Mancuso*, 999 F. Supp. 2d 269, 285 (D.D.C. 2013).  Without more, the court cannot conclude that that the District has effectively adopted an unconstitutional policy by custom.

Because Plaintiff has failed to plausibly plead that the District was by policy or custom the moving force behind the First Amendment violation she alleges, there is no basis for municipal liability.  The court will accordingly grant Defendants' motion to dismiss Plaintiff's First Amendment claim against the District.

**B.  Hostile work environment claims**

Plaintiff claims that Defendants created a hostile work environment based on race, color, national origin, or age, thereby violating Title VII, the ADEA, and the DCHRA.  TAC ¶¶ 40-45,

---

[5] Plaintiff also makes the contradictory allegation that Defendants' retaliation was "required by section 7.11.1."  TAC ¶ 30(a).  The court cannot agree, even at the motion to dismiss stage.  For one, courts do "not accept as true self-contradictory factual allegations."  *Amore ex rel. Ests. of Amore v. Accor N. Am., Inc.*, 529 F. Supp. 2d 85, 94 (D.D.C. 2008) (citing *Kaempe v. Myers,* 367 F.3d 958, 963 (D.C. Cir. 2004)).  "Nor must we accept as true the complaint's factual allegations insofar as they contradict exhibits to the complaint or matters subject to judicial notice."  *Kaempe*, 367 F.3d at 963.  As the court has noted, the full text of the Bargaining Agreement is subject to judicial notice.  *See supra* Section I.A.  Section 7.11.1 recognizes that interpersonal differences should be resolved in private but does not require the principal or the District to punish someone who violates the policy.

51-57, 61-68 (Counts 2, 4, and 6).  Insofar as those claims rely on national origin-based hostility

or are raised against Krughoff in her individual capacity, they cannot survive the motion to

dismiss.  But Plaintiff has adequately stated the remaining claims.

    1.  <u>National origin claims</u>

       Plaintiff's national origin-based claims cannot proceed for at least two reasons.  The first

is Plaintiff's failure to exhaust this claim in her EEOC charge.  Where an "EEOC charge

contained no claims or factual allegations that could reasonably be expected upon investigation

to lead to a hostile work environment claim," she has "failed to exhaust her administrative

remedies for such a claim."  *Park v. Howard Univ.*, 71 F.3d 904, 907, 909 (D.C. Cir. 1995).

Although "Plaintiff checked the box for 'national origin' on her EEOC charge, the body of the

charge makes no mention of national origin discrimination."  MTD at 28.  It is not sufficient, as

Plaintiff contends, for the charge to merely mention that Krughoff was "Hispanic."  Opp'n at 18-

19.  That allegation does nothing to establish an atmosphere of discrimination against Plaintiff

based on her own national origin, much less give rise to the reasonable expectation that an

investigation would lead to a hostile work environment claim.

       Second, the Third Amended Complaint is similarly devoid of any allegations to support

Plaintiff's national origin-based hostile work environment claim.  Like her EEOC charge, it does

no more than state the Plaintiff's and Defendant's respective national origins.  TAC ¶¶ 3(a),

15(c).  For example, it makes no allegations about any remarks, actions, or disparities by virtue

of national origin.  Likewise, Plaintiff does not allege that she was treated worse than anyone

else, much less a similarly situated coworker, because of her national origin.  *McNair*, 213 F.

Supp. 3d at 87-88.  Thus, even assuming that Plaintiff was treated unfairly, "there are not

sufficient allegations demonstrating that such treatment stemmed from discrimination on the

basis of" her national origin.  *Speer*, 251 F. Supp. 3d at 273.

For these reasons, the court will grant Defendants' motion to dismiss Plaintiff's claim of national origin-based hostile workplace environment.

2. Claims against Krughoff

Plaintiff's hostile workplace environment claims against Krughoff likewise cannot succeed. Neither Title VII nor the ADEA authorize liability against individuals in their personal capacities—only against the employers themselves. *Thomas v. Wash. Metro. Area Transit Auth.*, 305 F. Supp. 3d 77, 86-87 (D.D.C. 2018) (citing *Gary v. Long*, 59 F.3d 1391, 1399 (D.C. Cir. 1995) (Title VII); *Atchinson v. District of Columbia*, 73 F.3d 418, 424 (D.C. Cir. 1996) (ADEA)). As for the DCHRA claim, Defendants persuasively argue that because Krughoff did not become principal until mid-2017, she cannot be held accountable for most of the incidents allegedly comprising Cleveland's hostile environment, which happened before her tenure. MTD at 29-30. Plaintiff does not respond to that argument, *see* Opp'n at 20-29, and therefore concedes it, *Am. Waterways Operators v. Regan*, 590 F. Supp. 3d 126, 138 (D.D.C. 2022) ("If a party fails to counter an argument that the opposing party makes in a motion, the court may treat that argument as conceded.") (citations omitted). Accordingly, the court will dismiss Plaintiff's hostile work environment claim against Krughoff.

3. Remaining claims

The remaining hostile work environment claims are asserted against the District and based on race, color, or age. Plaintiff has adequately pleaded these claims.

By "[t]heir very nature," hostile environment claims "involve[] repeated conduct"; they are "based on the cumulative effect of individual acts." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002). That effect must be "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Id.* at 115

(quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).  As the Supreme Court stated in

*Morgan*:

> In determining whether an actionable hostile work environment claim exists, we
> look to "all the circumstances," including "the frequency of the discriminatory
> conduct; its severity; whether it is physically threatening or humiliating, or a mere
> offensive utterance; and whether it unreasonably interferes with an employee's
> work performance."

*Id.* (quoting *Harris*, 510 U.S. at 23).  Drawing all reasonable inferences in Plaintiff's favor, the

court finds that her allegations sufficiently state a plausible claim of hostile work environment

under these factors.

Plaintiff pleads frequent and severe instances of discrimination.  Over a five-year period

(2013-2017), Plaintiff alleges:

(1) Four instances in which Cleveland administrators targeted middle-aged Black women
teachers for unjustifiably low performance evaluations, intending to bring about their
removal, *see* TAC ¶¶ 16(d), 19(d), 21(k), 21(i), two in which the teachers felt forced
to retire to escape the discrimination, *id.* ¶¶ 16(m), 21(n);

(2) Another instance in which a middle-aged Black woman teacher was "railed
against"—intentionally targeted for discriminatory criticism—until she felt forced to
retire, *id.* ¶¶ 18(f)-(i);

(3) Prolonged preferential treatment for White parents in fundraising for extracurricular
activities, *id.* ¶¶ 17(b)-(f);

(4) Intentional racial and ethnic disparities in Cleveland's dual-language program that
effectively "segregated" White students into better-resourced classes, *id.* ¶¶ 4(c),
22(c)-(e);

(5) Cleveland administrators taking actions to "warn[] middle-aged black professionals against objecting to the demands of Cleveland's white gentrifying parents," *id*. ¶ 20, or requiring its employees "to support the dual language program or to keep quiet about its racist segregation of Cleveland's students," *id.* ¶¶ 22(k), (m), (o);

(6) An organized "campaign" against Plaintiff, promoting the false narrative that she "abandoned the Cleveland students at the JFK Airport" which was part of a "conspir[acy] to target [her] . . . to be removed from Cleveland on the basis of her race, color, national origin," *id.* ¶¶ 25(d)-(e);

(7) Two instances of Black Cleveland employees' jobs being excessed as punishment for protesting Plaintiff's involuntary transfer; one employee was effectively forced to retire, *id.* ¶¶ 26(v)-(z); and

(8) Krughoff pursuing adverse action against Plaintiff because of her PTA speech condemning discrimination at Cleveland, which ultimately made Plaintiff feel that she had no choice but to retire, *id.* ¶¶ 31(a)-(b), 35(h)-(*l*), 36.

Although some of these instances of discrimination were not directed at Plaintiff specifically, taken together, these allegations plausibly allege a pervasive pattern of overt discrimination at Cleveland. While perhaps different from the prototypical hostile workplace events like "intimidation, ridicule, and insult," *Morgan*, 536 U.S. at 116, such repeated and targeted unfair treatment could nonetheless create an "abusive working environment . . . so intolerable that . . . resignation qualified as a fitting response," *Pennsylvania State Police v. Suders*, 542 U.S. 129, 133-34 (2004).

Defendants' counterarguments are unavailing. They are incorrect that the intentional targeting of middle-aged Black women for unfair treatment is "nothing more than the 'ordinary

tributions of the workplace.'" MTD at 25 (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998)). And they are equally mistaken that years of such persistent treatment amounts only to "several discrete acts and does not show any severe or pervasive harassment." MTD at 26. Indeed, as Defendants acknowledge, courts have expressly identified "'historic discrimination' over a period of several years" as an "aggravating factor[]" supporting a constructive discharge claim. *Id.* at 27 (quoting *Floyd v. Lee*, 85 F. Supp. 3d 482, 521 (D.D.C. 2015)). Of course, Defendants may marshal evidence to challenge Plaintiff's individual allegations and their collective effects. But that evidence will be considered at summary judgment or trial. The court will not dismiss Plaintiff's hostile workplace environment claims at this stage.

## C. Retaliation claims

Plaintiff also raises retaliation claims under Title VII, the ADEA, and the DCHRA. Her pleadings do not clearly identify the act(s) she believes to be retaliatory. *See* TAC ¶¶ 72-84. But her briefing clarifies that her retaliation claims are based on Defendants' creation of a hostile work environment. *See* Opp'n at 29-32; Reply at 15. Here, however, Plaintiffs' allegations do not plausibly support those claims.

"In this circuit, a hostile work environment can amount to retaliation." *Hussain v. Nicholson*, 435 F.3d 359, 366 (D.C. Cir. 2006). But as with all retaliation claims, Plaintiff's allegations must support the plausible inference that her employer retaliated against her based on her protected activity. *Id.* at 366. Here, Plaintiff argues that Defendants' "acts of retaliation responded immediately to Lang's [PTA] speech, which condemned Cleveland's hostile workplace." Opposition at 31. But most of the instances of discrimination Plaintiff identified as creating a hostile environment occurred before her PTA speech on November 15, 2017. *See supra* Section III.B.3. After that speech, the only discriminatory actions Plaintiff identifies are her being placed on administrative leave during DCPS's disciplinary investigation, and

Cleveland's excessing her former job.  Opposition at 31.  But those actions far more closely resemble the "personnel decision[s] taken by a public agency allegedly in reaction to the employee's behavior," *Connick*, 461 U.S. at 147, or other "[d]iscrete acts" that, while they may or may not be actionable on their own, do not occur "repeated[ly] . . . over a series of days or perhaps years" and therefore cannot give rise to a hostile work environment claim, *Morgan*, 536 U.S. at 115; *see id.* at 114-17.[6]  Taken alone, they do not plausibly establish that "the discriminatory conduct was so severe or pervasive that it created a work environment abusive to employees." *Suders*, 542 U.S. at 133.  Accordingly, the court will grant Defendants' motion to dismiss Plaintiff's retaliation claims.

**D.  Failure to protect claims**

That leaves Plaintiff's claims based on Defendants' negligent failure to protect her from the hostile work environment.  These claims are not cognizable.

Under District of Columbia law, "a common law claim of negligent supervision may be predicated only on common law causes of action or duties otherwise imposed by the common law." *Young v. Covington & Burling LLP*, 736 F. Supp. 2d 151, 164 (D.D.C. 2010) (quoting *Griffin v. Acacia Life Ins. Co.,* 925 A.2d 564, 576 (D.C. 2007)).  Plaintiff raises her hostile work environment claims exclusively under Title VII, the ADEA, and the DCHRA.  As a result, these claims are duplicative of Plaintiff's statutory hostile work environment claims and must be dismissed.  *See id.* at 163-65 (dismissing Title VII and ADEA claims).

---

[6] It appears that the allegedly retaliatory actions against Robyn Knight and Rodney Carter also took place after Plaintiff's PTA speech.  *See* TAC ¶¶ 26(v)-(z).  But Plaintiff does not cite those actions as contributing to the retaliatory hostile work environment she alleges, *see* Opposition at 29-32.

Plaintiff mistakenly relies on *Vance v. Ball State Univ.*, 570 U.S. 421, 446-47 (2013), in which the Supreme Court mainly addressed the question of "who qualifies as a 'supervisor' in a case in which an employee asserts a Title VII claim for workplace harassment?" *Id.* at 424. The Court concluded that in that context, a supervisor is someone who "is empowered by the employer to take tangible employment actions against the victim," and a supervisor's harassment renders the employer strictly liable under Title VII. *Id.* In addition, the employer could be held liable if it was "negligent in failing to prevent harassment from taking place,"—if, for instance, it "did not monitor the workplace, failed to respond to complaints, failed to provide a system for registering complaints, or effectively discouraged complaints from being filed." *Id.* at 449. Plaintiff apparently reads that latter portion of *Vance* to establish a freestanding, common-law, negligence-in-preventing-hostile-workplace cause of action. Nothing in *Vance* supports that reading. Throughout the opinion, the Supreme Court made clear that it was speaking about ways to establish an employer's "liability *under Title VII*," not any statute or common-law doctrine. *Id.* at 424 (emphasis added); *see, e.g.*, *id.* at 426-27, 450. *Vance* therefore does not permit Plaintiff to assert her independent claims of negligent failure to protect against a hostile workplace environment, and they will be dismissed.

## IV.    CONCLUSION

For these reasons, the court will GRANT in part and DENY in part Defendants' Motion to Dismiss, ECF No. 18.  Specifically, the court will DISMISS the following claims: Count 1, as against the District; Counts 2, 4, and 6, as against Krughoff; and Counts 3, 5, 7, 8, 9, 10, and 11, as against both Defendants.  That leaves the following claims: Plaintiff's First Amendment claim (Count 1) as against Krughoff, and Plaintiff's hostile workplace environment claims (Counts 2, 4, and 6) as against the District.  A corresponding Order will accompany this Memorandum Opinion.

Date: March 30, 2023

*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge